Mr. Sewell. Good morning. May it please the court, my name is Rusty Sewell and I represent the appellant, which I'll refer to as CBS for ease of reference throughout the argument. At issue in this appeal is whether a non-exclusive engagement letter obligates CBS to pay Catalyst a nearly $4 million commission on a transaction that closed 15 months after CBS terminated its relationship with Catalyst, a transaction that Catalyst admittedly did not participate in and was unaware of until days before it closed in August of 2021. The most important question before the court is the construction of the engagement letter and whether under the proper construction of the engagement letter, the procuring cause doctrine applies to the party's relationship, such that Catalyst, in order to earn the advisory completion fee at issue in this case, had to procure the HERC transaction, which is the transaction at issue in this case. In other words, put simply, the issue in this case is whether or not Catalyst had to earn the $4 million that the district court said it was entitled to. Under the plain language of the engagement letter and governing Texas law, the resounding answer is yes. Catalyst would only be entitled to the advisory completion fee under the terms of the engagement letter if it was the procuring cause of the HERC transaction. That's because the engagement letter designated Catalyst as CBS' non-exclusive agent. In Texas, a non-exclusive agent has to procure a sale or procure a transaction in order to earn a commission. All right, I may be missing it. Procuring cause comes up a lot in real estate matters and all that sort of thing. Yes, Your Honor. The argument, as I understand it in the trial judge, is that under circumstances where nothing else was contemplated, that might be alive and well. Whereas here, you've got this sophisticated document, et cetera, et cetera. Essentially, procuring cause was defaulted out, so to speak, or the document itself triggers and we're not into the world of procuring cause. I mean, you may be misstating it all, but how does procuring cause remain viable in the scope of this agreement where there are all these causes and so on and so forth? What's your best case that it's thriving here in the midst of all this? Do you follow me? I do follow you. I'll answer. There's two questions there. How does the procuring cause doctrine remain viable? It remains viable because of the non-exclusivity provision. The plain and ordinary meaning of a non-exclusive agent under a commission agreement is that the agent must procure the sale or the transaction in order to earn the commission. So you're tying the procuring cause doctrine, let me just say it, to the idea that somehow it's an escape hatch out of the contract because it was a non-exclusive agency? I wouldn't call it an escape hatch. I would call it an affirmative obligation or condition to payment. What's your best case that supports that idea that somehow the parties can contract and delineate, as Judge Stewart had just asked, with all these specific provisions, but because it's non-exclusive, procuring cause doctrine still sneaks in to dictate the case? So on page 23 of our brief, we cite the Wade oil and gas utilities operating case. And we cite that case for the proposition that granting an exclusive right to sell in a contract has to be explicitly stated. And while it certainly stands for that proposition, the facts are very similar to the case at hand. In that case, the owner of mineral rights signed an exclusive listing agreement with a broker, and the broker had the exclusive right to seek or solicit offers for the purchase of the owner's mineral rights. But what do you do with the contract language then that dictates otherwise, the 18-month term in which the fee would be payable and all those things? Is that just mere surplusage? It's not surplusage because you have to harmonize the provisions. And in the Wade case, that's what happened. There was a provision in the Wade case that said he was an exclusive agent. However, it went on to say that in the event of a sale of the property, the owner agreed to pay the broker a commission at closing. And the broker argued what Catalyst is arguing here. He said that gave me, that gave it the exclusive, essentially gave it the exclusive right to sell the owner's property. And the court said no. The court said even though it states that in the event of a sale of a property, the owner agrees to pay a commission at closing, all it created was an exclusive agency. And an exclusive agency and a non-exclusive agency, the owner retains the right to sell the property directly and independent from the broker without incurring the obligation to pay a commission. And that's what happened in this case. CBS directly and independently negotiated a sale 15 months after it terminated with Catalyst. And it had the right to do that without having to pay Catalyst a fee. And that's how the Wade court harmonized those two provisions. It said even though there's that language that says the commission is owed, if there is also language that the owner retains the right to independently sell the property and that occurs, the owner does not owe the agent a commission. And again, that's Wade Oil and Gas Utilisys. That was on page 23 of our brief. Under the district court's construction, by essentially ignoring, and if you read the summary judgment order and the reconsideration order, the non-exclusivity provision doesn't come up. And under the construction, it essentially reads that term out of the agreement and grants Catalyst the exclusive right to sell, whereby Catalyst would be entitled to this advisory completion fee, provided it performs some services, so it did have to perform under the contract, and an eligible transaction closed during the term of the agreement or within 18 months. In other words, Catalyst didn't have to procure that sale. So by taking the non-exclusivity language and ignoring that, it gets rid of the procuring cost option, which was affirmatively indicated in the party's agreement under the non-exclusivity provision. Why do I remember that Catalyst was involved in introducing the purchaser and the seller at some point prior, well prior to the transaction? Because I mean, that's correct. And we don't dispute that. In fact, throughout prior agreements, I think there had been discussions with HERC, which was the ultimate buyer, but also in September, I think in August and September of 2019, Catalyst's representative, Mr. Condrip, was discussing the possibility with HERC of a transaction with CBS, and Mr. Condrip testified that several weeks later, Catalyst, I'm sorry, HERC came back and said, it's something to the effect of not no, but not now. It wasn't interested in CBS at that time. Fast forward, CBS terminates the engagement. But wouldn't Catalyst then have the argument that procuring costs, doctrine or not, we are still entitled to our fee because we helped procure it? They would have that argument, but it would be incorrect, because that's simply claiming credit for a general relationship. In the Perthuis case, what the Supreme Court said was that's not enough. And not only that— Well, I mean, it's not a general relationship. It's an agency to sell the business, an agreement, right? And I don't know. I go back to real estate, and I know the contracts are very different, but the standard real estate contract says anybody that you don't exclude, basically, during this listing period, I get the fee because I'm going to be the broker who procures the sale. I mean, effectively, they kind of address that, and I mean, am I wrong to think about this case that way? You're not wrong in the sense that I agree it's very similar to a real estate contract in that he acted as a broker, he marketed it, he was screening offers, he was advising on contract negotiations. But the difference here is, first of all, they didn't exclude anyone, and second of all, there was a—under the law, there's a new and intervening cause. Well, but I mean, I guess they do those kinds of things in real estate contracts to avoid this very dispute, i.e., if we introduce you to somebody or we're involved with a buyer or a potential seller or vice versa, then if that sale eventually happens, we get our brokerage fee, and so there isn't a dispute about, well, how much did you do or did you do it or did you not do it, and that goes sort of back to the idea that we've got a contract here that says, here's what happens, and you're arguing sort of around the language of the contract or that it doesn't apply because they weren't the procuring cause, but I don't know, is that some sort of fact issue that we have to send it back for, or is it—does it defeat your claim or your position? If the court finds that the procuring cause doctrine applies to the engagement letter, then it's a fact issue. And we have argued that it's a matter of law, but generally it's considered a fact issue, and at a minimum, it would be entitled to a remand for a jury to determine whether or not they did enough to procure this transaction. And again, it's not enough for them to simply say, well, we introduced you. As the Tower View case that we cited in our brief states, mere effort alone is not enough to secure a commission for procuring a purchaser, and that's all really that Catalyst is arguing in their brief is that, well, look, we took all these advisory services, we prepared marketing materials, we maintained communications, but they were paid for those services. They received $25,000 every quarter for those services. The advisory completion fee is something different. It is a payment of a transaction, or in this case, the HERT transaction. The trial judge here, Judge Ellison, has been on the bench a long time. He's a very experienced Texas lawyer, experienced with all this, saw all this, this document, the contracts, the arguments being made, and the trial judge said no, based on the provisions here in the statute. He definitely was tuned in to exactly what's being urged, the document, the contracts. He goes through it excruciatingly, et cetera. Everybody makes their arguments and so forth. Where's the clear error in terms of what he missed here, or his misconstruction of these fair cases that you're citing? I'm not saying he can't be wrong. That's what we get paid to do. I'm just trying . . . he's tuned in. These are the same arguments that were made, same contracts, same provisions. There was no rush to judgment, if you will, in these re-arguments made. Where did he go off the track from your standpoint of whatever? From our standpoint, he went off the track by not taking into account and giving proper weight to the non-exclusivity provision. The ordinary meaning of that term is that we retain the right to directly and independently sell the company without having to incur the obligation to pay, catalyst the advisory completion fee. He read the language for any transaction completed during the period from the date of determination, 18 months after the date of determination letter, as being an intentional negotiating between the parties of not wanting to operate based on a default operation of law, but expressly this is what these parties contemplate. This occurred within 18 months. I agree. We acknowledge that that language is in that agreement, but our position is that concerns the timing and the amount of payment, but the non-exclusivity language implicates how catalyst can earn the fee and whether it's entitled to a fee if, as it happened in this case, CBS went out and, independent of catalyst, sold the company to a third party. You would say all they were entitled to, what'd they get, $150,000? I'm sorry, Judge. You would say they were only entitled to what, $150,000? Didn't they get some . . . I believe they were paid somewhere in the neighborhood of $150,000 for the advisory services fee, which is . . . We're talking about the difference between $150,000 and six figures, right? Correct, Your Honor. I think we look at it the other way. We have a situation where, under catalyst construction of the agreement and the district court's order, it produces this absurd result where 15 months after the engagement letter was terminated and catalyst was out of sight, out of mind, this HERC transaction was out of sight, out of mind for catalyst, the agreement closes and catalyst comes up and says, well, we need $4 million. We're entitled to it. Catalyst didn't earn that money. It didn't do anything to procure this transaction. The services it did provide, it was paid for, and again, it was paid $150,000, which I understand that's not $4 million, but that's not nothing. It's not chump change. They did receive payment for their services. We think this produces an inequitable result, and the Texas Supreme Court has said that the court should avoid, when possible, a result or construing an agreement that results in an inequitable or . . . I mean, a homeowner has a house with a listing, with a broker, for X period of time. During that period, the real estate agent brings all these people to see the house, inspect the kitchen, and on and on and on. The broker's term expires by whatever period of time the homeowner puts the sign for sale by owner. Sometime rocks along, and lo and behold, somebody that the broker brought through early on is the one who buys the house. Well, I know the brokers come and say, holy smokes, you owe me a fee. Perhaps the homeowner says, not so fast. Your agreement has ended. I mean, that sends it to his own procuring cause. Again, I admit this is not a real estate, but it's hard not to circle back to these notions. The broker wouldn't be saying . . . if somebody said that it's a windfall, they'd say, you would not have known about this entity in this specialized market like we have here, but for our efforts, et cetera, et cetera, we put this clause in here. If you didn't want us to get a fee, then you could have negotiated something that says, under no circumstance, in the absence of that, give us our money. Well, the situation that you're describing occurred in the Miller case, the Henry S. Miller residential case that we cite in our brief. That buyer was introduced by the broker, but the sale didn't occur until five and a half months later after the broker's term expired, and it occurred because of direct and independent negotiations between the owner and the ultimate buyer. The court said, the broker's not the procuring cause because the passage in time and the direct and independent negotiations constituted a new and intervening cause. And to your point about whether or not there was explicit language saying, under no circumstance, you're entitled to it, we would argue, again, that's what the non-exclusivity provision says under the plain meaning, is that we retain the right to directly and independently sell the company without having to pay, catalyst, the advisory completion fee. In other words, under no circumstances, if we sell the company on our own without your involvement, are you entitled to it? Okay. Thank you. We appreciate you. You've reserved your rebuttal time. All right. We'll hear from Catalyst. Mr. Pitts? May it please the court, the district court got this case right, and this court should affirm. Under the terms of a negotiated services contract, Catalyst Strategic Advisors provided extensive professional services to Prime and Ready CBS for a company-wide sale at a premium value. Catalyst, in fact, positioned CBS for its $190 million sale to Herc Rentals, a publicly traded company who knew of and viewed CBS as a lucrative acquisition target because of Catalyst's hard work. And yet, CBS refused to pay the full fee that's clearly required by contract, even after admitting to Herc Rentals that it owed Catalyst the fee. That was unfair, and it was a clear breach of the contract. The district court saw that, and in a thorough opinion, correctly granted summary judgment for Catalyst. The district court did not miss anything. Your Honor, CBS says that this case is not really about the contract's clear terms. It is about procuring causation that triggers only where the parties have not provided their own rules for paying or withholding commission. Your Honors, this is not a procuring cause case. They point largely to the exclusivity provision. I'd like to say three things on the non-exclusivity provision. First, the non-exclusivity provision itself in Section 2H of the agreement made clear that CBS's hiring of other advisors does not interfere with Catalyst's right to the fee. The parties in their contracts already said that the hiring of the non-exclusivity does not affect the right to the completion fee. I would also note that in this case, CBS undisputedly did not use any other financial advisor with regards to this large transaction. Catalyst was the only financial advisor who was ever involved in the process. Third, and most importantly, I would say the Texas Supreme Court's decision in Perthews made very clear that there are no magic words needed to displace the default rule of procuring causation. The parties can displace it by any language in their contract, and here they clearly did, Your Honors. The negotiated terms between the parties dictate the outcome, and no extra rule of common law is needed in order to enforce them. The Perthews decision also noted, a contract merely needs to provide terms that are inconsistent with the default rule. In the very first sentence of the Perthews decision, it said, when a seller agrees to pay sales commissions to a broker or other agents, the parties are free to condition the obligation to pay commissions however they like. That's what the parties did here. If you look at the plain terms of the contract, it requires that CBS pay the completion fee for any transaction defined as a potential transaction, which is completed within 18 months of termination of the agreement. The transaction here occurred within that 18-month tail period, and CBS owes the fee, Your Honors. CBS urges the default rule only in an effort to avoid the contract that it made with Catalyst in return for services that it actually got. The record is full of examples here of how hard Catalyst worked for CBS. Selling a large revenue in 175 employees. Under the terms of the 2019 agreement, Catalyst analyzed and did due diligence on CBS's business and presented the desirable aspects of the companies to buyers, including to Herc Rentals specifically. It positioned and advocated CBS's desirable acquisition target to its industry contacts, including to Herc Rentals specifically, and to the leadership of Herc Rentals. The record reflects that Herc Rentals knew of CBS's value acquisition opportunity owing to Catalyst's hard work. Catalyst's contrary claim to have triggered a $190 million corporate transaction by a private LinkedIn message is an affront to Catalyst's hard work in this case. And I'll direct the Court to a Texas decision that is the same fact pattern as the one here, and that's the Ebi Holiday v. Gianbroni case cited in our briefing. In that case, the parties had an exclusive listing agreement. It was to sell a property between an agent and a seller. The parties terminated the exclusive listing agreement by a separate termination agreement. The termination agreement had an 180-day tail provision for the sale of property, and that contract provided owner will pay broker for a sale of property to anyone. The Dallas Court of Appeals looked at that issue, and they said that the tail provision displays the default rule of procuring causation even after the trial court had found it applied, and it rendered judgment for the agent. This case is indistinguishable from the Gianbroni case, and we have the answer in Texas cases. Your position is that even if there was a sale, no dispute, Catalyst wasn't the procuring cause, the two owners know each other, whatever happened, and Catalyst had nothing to do with the transaction coming together, your position is that it's in that 18-month period, Catalyst gets its fee? Yes, Your Honor, but I think . . . What does non-exclusivity mean then in the contract? Yes, Your Honor, so non-exclusivity in the contract means that they can go out and hire other advisors who they can negotiate their separate compensation engagements with in order to consummate a big corporate transaction. Does it mean that they could sell it themselves? They could sell it themselves, Your Honor, but that does not get them out of paying the completion fee, because under Section 2 of the agreement, the advisory fees or services are defined, and once Catalyst renders those advisory services, once it performs under the contract, the district court found substantial performance, and no one is challenging substantial performance of advisory services on appeal. That finding and determination by the district court is undisputed on appeal. Catalyst substantially performed, and the substantial performance under the contract triggered the right to the completion fee within the tail period, and it doesn't matter after that point. And I would just note, and this is related, enforcing the contract as written does not create an unfair something-for-nothing situation. Here we have two sophisticated parties who agreed the performance required for Catalyst to earn the completion fee. What this means is that CBS itself valued and priced Catalyst's performance of the advisory services for a potential transaction is worth paying the transaction fee. That was the consideration of the agreement. Section 2 says in compensation for Catalyst performing the advisory services, CBS will compensate Catalyst as followed, and then it has all the compensation. That's what the parties agreed in their contract. And I think the last thing I'd want to tell the court is that there's a reason the engagement agreement is structured as it is, and that's because of the nature of Catalyst's specialized services in this case. It is not a mere matchmaker or a listing agent. It did not just post CBS for sale on a database or in a newspaper. Catalyst leveraged its in-depth industry knowledge and relationships to position CBS, like its other clients, for a premium value regardless of who the ultimate buyer is. The services were fungible, and they were valuable, and they were valuable to CBS for the actual transaction at issue. The agreement is structured as it is to ensure compensation for Catalyst's value-increasing services. And the record also supports the completion fees and tail provisions are standard industry practice for M&A advisors like Catalyst, and they serve a good purpose. They allow a small upfront fee for sellers, and they encourage hard work by the advisors to create value for clients. To impose a rigid and unintended causation standard would send shockwaves to the industry and create friction in the relationship between sellers and their trusted advisors. Your Honors, this is not a procuring cause case. It's not about real estate brokers or listing agents or terminated sales or handshake agreements. This is a breach of contract case. The district court saw that. It was about services to repair a large company for a lucrative sale in which two sophisticated parties negotiated and agreed to the terms of the completion fee. I want to mention two cases that my counsel on the other side mentioned. The one is the Wade case. That case didn't mention procuring cause at all. The parties had negotiated a different term in their contract, and that term was—had a tail period, and the tail period required the buyer to be identified by the agent to the seller. And there's no dispute in that case that the buyer was not identified by the seller, so the court just enforced the contract. It did not imply a procuring cause. The other case that was mentioned was the Arthur S. Miller case. In that case, the contract expressly required the agent to be the procuring cause. The actual contract used the words procuring cause. And I think that's all I would add unless the court has further questions. Okay. On page 47 and 48 of your brief, you said that if you were to prevail, not you I just had a note to ask about it. I just wrote myself a note. Yes, Your Honor. So, you're urging that if the panel agrees with your position in the law school, what is it? You're asking for permission to file a separate motion seeking appellate attorneys fees here or elsewhere, or what? Just help me understand. Yes, Your Honor. We saw case law that this court will occasionally consider appellate attorneys fees on appeal just to expedite the post-decision process. And so, we would request either to file a motion in this court or we would also be fine with a remand for the district court to determine the appellate fees. Whichever the court prefers, we just thought it might expedite the finality of the case. Okay. Well, as they say, no harm in asking. Yes, Your Honor. Okay. Well, I'm not speaking for the panel, but it's highly unlikely we're going to deal with fees. So, at best, at worst, however you look at it, it would be sent back elsewhere for that. But you preserved the issue. I just wanted to make sure I understood what was being asked, whether it was advanced permission to file a separate motion on this matter or whether it picked up here and to tee it up now so whatever counsel officer has to say about it. I mean, it's not . . . I'm not saying we've decided the case, but because it's in the brief, I wanted to bring it up so I can be clear at least and then if the other side has anything to say about it, they can. Yes, Your Honor. We just thought we would give the court the opportunity in case it felt like delving into the fees. We prefer all the help we can get. Thank you. Thank you, sir. Thank you. All right. Back to you, Mr. Sewell. And that latter matter, you don't have to start with that. That was just kind of laying you up. You can deal with that if you want to, but use your time as you see fit. Thank you, Your Honor. I think it's very telling that counsel essentially admits that what they're saying is that Catalyst had the exclusive right to sell CBS. And he said that even if we directly and independently sold it, they are entitled to the advisory completion fee. That is an exclusive right to sell. There is nothing in the engagement letter that gives it the exclusive right to sell. And in fact, of course— We don't consider you have the right to sell it. It says you got exclusive right to sell it, but you do within 18 months. You still got to pay the fee. Correct. But their position is that even if we directly and independently negotiate the sale, they are still entitled to the fee. And that renders the non-exclusivity provision meaningless, which the court cannot do. The non-exclusivity provision has to be given weight. Well, they say non-exclusive means, yes, you can sell it or somebody else can sell it. But they also say, but whenever it's sold, if it's within 18 months of the end of the agreement, you still owe us money. Isn't that what they're saying? Am I missing it? That's what Catalyst is saying. No, you said that's not correct, but that's what they're saying. They're conceding the non-exclusivity provision vis-a-vis you can sell it to somebody else. But I don't understand that concession to mean that they're conceding that that vitiates the 18-month time period. Correct. I think we're maybe saying the same thing different ways. I think what they're saying is, yes, it's non-exclusive, but even if they sell it, we still get the fee. And our position is effectively that's an exclusive right to sell, and the language in the agreement doesn't state that. Also, they brought up the sophisticated nature of the transaction, and of course it was a very sophisticated transaction and a sophisticated role for Catalyst, but that doesn't change the ultimate nature of what it was, and Catalyst was a broker here. And just like we talked about with the real estate contract, the Texas Supreme Court in the Perthus case on footnote 7 talks about how the procuring cause doctrine has been applied far beyond the real estate industry in Texas, and it cites a litany of cases in which were not real estate cases that the procuring cause doctrine was applied. If it's a commission agreement, the procuring cause doctrine is implicated. That's our position. They referenced the Ebi Halliday case. Again, the distinction there is that in Ebi Halliday, the agreement essentially gave it the effect of the exclusive right to sell. There was no non-exclusivity language, so we don't think that is instructive in this case. As far as the Wade case, yes, it doesn't mention procuring cause, but it still stands for the proposition that in an exclusive agency, or in this case a non-exclusive agency, the owner retains the right to sell the property without incurring the obligation to pay a commission, even if there is language in that agreement that states a commission will be paid upon closing. Again, we do not dispute that Catalyst performed services. We do not dispute that I believe in the termination notice, CBS thanked Catalyst for its efforts and said that it had done a good job. But again, mere effort alone is not enough to be the procuring cause of the transaction. Catalyst was paid for its services. We are not urging that the court apply the procuring cause simply as a default rule, because the agreement is silent. We are urging that the procuring cause doctrine applies because the parties affirmatively chose to make this a non-exclusive agreement, to which, under the plain ordinary meaning, the procuring cause doctrine applies in this case. I will see the rest of my time unless there are any questions. Oh, one more thing. I apologize. The district court did look at the appellate fee issue that Catalyst filed a motion and the district court denied the motion for appellate fees. Thank you. Thank you. All right. Thank you, counsel, for both sides for briefing and arguing the case. The case will be submitted. We'll get it decided. Appreciate it.